754 So.2d 132 (2000)
Alan MACKERLEY, Appellant,
v.
STATE of Florida, Appellee.
No. 4D98-0856.
District Court of Appeal of Florida, Fourth District.
March 22, 2000.
*133 Paul Morris of the Law Offices of Paul Morris, P.A., and Stephen H. Rosen of the Law Offices of Stephen H. Rosen, P.A., Coral Gables, for appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Robert R. Wheeler, Assistant Attorney General, West Palm Beach, for appellee.
STEVENSON, J.
Appellant, Alan Mackerley, was tried by jury and convicted of the first degree murder and kidnaping of his business competitor, Frank Black. We find persuasive Mackerley's two-pronged argument on appeal: (1) that the charging document and the evidence presented at trial were legally insufficient to support the charge of kidnaping; and (2) that the general verdict of guilt of first degree murder, which may have been predicated on a felony murder theory founded on the legally invalid kidnaping charge, may not stand. We reverse the kidnaping conviction, and but for the Florida Supreme Court's recent opinion in Delgado v. State, 25 Fla. L. Weekly S79, ___ So.2d ___, 2000 WL 124382 (Fla. Feb. 3, 2000), we would also reverse the murder conviction and remand for a new trial. As we will explain below, however, the holding in Delgado compels us to affirm Mackerley's conviction for first degree murder.

Facts
The victim, Frank Black, was Mackerley's competitor in the charter-bus industry. The State's theory of the case was that Mackerley tricked Black into coming down to South Florida from New Jersey, and when Black arrived, Mackerley killed him. The State presented evidence through the testimony of Black's family and friends that a woman from Florida called Black in New Jersey, said that she was interested in purchasing some school vans, and invited him to come to Florida to discuss the deal. The woman, who identified herself as Mia Giordano, was supposedly representing an exporting company wishing to ship the buses to South America. Giordano arranged to pick up Black at the airport and take him to the place where he would stay for the evening, and, then, she and Black planned to meet the principals to the deal for dinner. According to one of Black's business associates, the woman instructed Black to look for her when he got off the plane in Florida and described herself as "five foot tall, all legs, blonde, and the hottest thing he'll see when he gets off the plane." Mia Giordano turned out to be Mackerley's girlfriend, Lisa Costello.
After Black failed to return to New Jersey from his business trip and none of his family or friends heard from him, he was reported missing. Leanna Black, the victim's daughter, testified that her father told her of his plans to travel to Florida to discuss selling his buses with a prospective buyer. Black told Leanna that he planned to fly from New Jersey to Florida on Saturday, February 24, 1996, and to return home on Sunday or Monday. Diane Black, the victim's other daughter, identified his signature on a Kiwi Airlines Boarding Pass, dated February 24, for a flight from Newark, New Jersey, to West Palm Beach, Florida.
Both Diane and Leanna testified that it was unusual for several days to pass without them conversing with their father, and that he was in constant contact with his office when he traveled. Leanna stated that her father had not packed for a long trip, and that none of his personal assets or belongings were missing. Additionally, Black and Leanna had scheduled a meeting for Tuesday, February 27. Both of *134 Black's daughters testified that Black avoided contact with Mackerley.
Sally Roberts, Black's girlfriend and office manager, added that he told her he planned to come back from Florida on Sunday or Monday. Roberts noted that it was very unusual for Black not to be in contact with his business for any length of time. She also indicated that a week prior to February 24, 1996, a person calling herself Mia Giordano had telephoned Black's office on several occasions.
Michael Driscoll, a special agent with the Florida Department of Law Enforcement, testified that Lisa Costello's and Mackerley's phone records indicated that several calls were made from their respective homes to Black's residence and business in New Jersey prior to Black's trip to Florida. Phone records also showed several calls on February 24 from Mackerley's cell phone to Kiwi Airlines in New Jersey and to the Hertz rental car agency in West Palm Beach adjacent to the airport.
Lisa Costello picked up a rental car from Hertz on February 24. Costello paid for the car with cash and returned the car on February 26, after traveling four hundred and twenty-three miles. Black's debit card was used at a phone and fax machine at an Embassy Suites Hotel in Riviera Beach, Florida, between 1:30 a.m. and 2:30 a.m. on Sunday, February 25. Agent Driscoll said that a night clerk for the hotel identified Costello as the woman who used the card at the phone and fax machine at that time.
Several weeks after Black was reported missing, the police questioned Mackerley. Mackerley denied knowing Mia Giordano or anyone fitting her description. The police investigators noticed that Mackerley was remodeling the front hallway, entry way, and front room of his home. He was in the process of painting his home and no carpet was down. Robert Samandajian, Mackerley's son-in-law, testified that he helped Mackerley begin renovating the front part of his house on or about February 26, 1996. Two weeks after the initial renovation project, Mackerley decided to re-carpet the entire house. The two vacuum cleaners that were used to clean up the construction debris were taken to the Martin County dump and thrown away. Other witnesses testified that Mackerley purchased a trash can, duct tape, trash bags, and cleaning supplies on February 25 and 26, and that Mackerley's boat had been out to sea.
The State's key witness, William Anderson, testified that he maintained Mackerley's plane. A few days after Black disappeared, Mackerley phoned Anderson and asked Anderson to fly him over the ocean to "look for something." When Anderson asked Mackerley what he needed to look for in the ocean, Mackerley admitted killing Black and dumping the victim's body from his boat into the Atlantic Ocean about 12 to 22 miles from shore. According to Anderson, Mackerley wanted to fly over the ocean to see if the body was floating. Anderson stated that he discouraged Mackerley from conducting an air search for the body because they would have to report the flight plan.
Eventually, Mackerley disclosed to Anderson that an accomplice had brought Black to Mackerley's house. Mackerley told Anderson that when Black recognized him, he grabbed Black in a headlock and "took a gun and shot him through the head turning his face away to avoid debris or splatter or whatever." Mackerley told Anderson that there was blood all over the walls, ceiling, carpet and floors, and that he had to remove the carpet.
The jury convicted Mackerley of murder and kidnaping as charged. Although the State had sought the death penalty, the jury recommended life imprisonment without the possibility of parole. The trial court followed the jury's recommendation and sentenced Mackerley to two concurrent life sentences.

*135 Corpus delictimurder

We first address Mackerley's argument that he could not be convicted of murder because the State failed to prove the corpus delicti prior to admitting his confession to Anderson. Our review of the record reveals that this issue is not preserved for appellate review and does not present fundamental error.[1]
Mackerley did not object when his statements to Anderson admitting that he murdered Black were introduced in the trial court, nor did he move for judgment of acquittal on the ground that the State failed to establish a corpus delicti independent of the confession. Florida Rule of Criminal Procedure 3.380(b) requires that a motion for judgment of acquittal "fully set forth the grounds on which it is based." Because appellant's motion for judgment of acquittal did not assert that the State failed to prove a corpus delicti for the crimes charged, this court may not consider that argument on appeal. See Johnson v. State, 478 So.2d 885, 886 (Fla. 3d DCA 1985); Sapp v. State, 411 So.2d 363, 364 (Fla. 4th DCA 1982)(on rehearing).
Nevertheless, even had the issue been preserved, we would conclude that the State proved the corpus delicti of murder before Mackerley's confession was admitted at trial. Murder cases in which the body of the victim is never found frequently evoke questions concerning whether the corpus delicti of the crime has been established prior to the introduction of a confession or admission. See Meyers v. State, 704 So.2d 1368, 1369 (Fla.1997); Bassett v. State, 449 So.2d 803, 807 (Fla.1984). As the Fifth District aptly pointed out in State v. Lindsey, 738 So.2d 974, 976 n. 1 (Fla. 5th DCA 1999), "[t]he term `corpus delicti' does not mean `dead body' but is more properly defined as the body, foundation, or substance of the crime." The Florida Supreme Court has embraced a three-part test to establish the corpus delicti for murder: "(1) the fact of death; (2) the criminal agency of another person as the cause thereof; and (3) the identity of the deceased person." Meyers, 704 So.2d at 1369 (emphasis added). In proving corpus delicti, "circumstantial evidence is sufficient" and "[p]roof beyond a reasonable doubt is not necessary."[2]Sochor v. State, 619 So.2d 285, 289 (Fla.1993); Drysdale v. State, 325 So.2d 80, 83 (Fla. 4th DCA 1976).
Mackerley contends that the State failed to establish a corpus delicti of homicide because the State did not demonstrate that Black was dead and that his death was the result of the criminal agency of another. In considering this argument, it is important to note that to establish a corpus delicti, the State is not obligated to prove the specific manner in which the victim died nor the identity of the person who committed the homicide. See Burks v. State, 613 So.2d 441, 443 (Fla.1993). The State need only present some direct or circumstantial evidence tending to show that the victim is dead and that the death was as a result of criminal activity. See id. Once the State has presented prima facie evidence of the corpus delicti, the State may then introduce the defendant's confession or admission against interest to show that the defendant is the perpetrator. See Stone v. State, 378 So.2d 765, 771 (Fla. 1979); McIntosh v. State, 532 So.2d 1129, 1131 (Fla. 4th DCA 1988).
The instant case is similar to State v. Lindsey, where the State appealed an order dismissing two counts of a murder indictment on the ground that the State failed to prove a corpus delicti for the alleged murders of Diane Richardson and *136 Donetha Snead. See 738 So.2d at 974. Like the victim in this case, the bodies of Richardson and Snead were never found. The State opposed the motion to dismiss and asserted that it could establish the corpus delicti through its circumstantial evidence. Diane Richardson's son, Damon, reported her missing after not seeing her for nine days. Damon stated that it was unusual for his mother not to call him for several days and that her belongings were present at her residence. Diane's roommate also said that it was unusual for her not to call if she planned to be away from home for more than one day. Similarly, Carolyn Snead reported her daughter, Donetha Snead, missing after not seeing her for two days. Donetha's sister expressed that it was highly unusual for her to be away from home for a long period of time. Additionally, none of Donetha's personal belongings had been removed from her residence. See id. at 976.
The Fifth District, in Lindsey, concluded that the trial court erred in dismissing the murder charges of the indictment because the circumstances surrounding the victims' disappearances alleged in the traverse pointed to the death of the victims by some criminal activity.
The facts surrounding the victims' disappearances indicate that such absences without contacting family or friends are out of character for the victims. The fact that both victims' belongings were left at their residences indicates that their absence was neither voluntary nor planned. In addition, the continued absence of the victims along with these other facts indicate a death that resulted from the criminal agency of another.
Id. at 977.
Likewise, before the trial court admitted Anderson's testimony that Mackerley confessed to murdering Black, the State presented evidence which suggested that Black's unannounced and unanticipated disappearance most likely meant that he was dead and that his death stemmed from the criminal agency of another. Black had purchased a one-way ticket to Florida in order to discuss selling his business, and Mackerley's girlfriend lured Black to West Palm Beach using an alias. Prior to leaving New Jersey, Black told both of his daughters, Diane Black and Leanna Black, that he would be returning home in a few days. Diane testified that her father had a cell phone, and that he was always in contact with his office and with his daughters. Neither Leanna nor Diane heard from their father again after he came to Florida. None of Black's belongings were missing, and he did not pack for a long trip. During his trip to Florida and shortly before he was reported missing, a desk clerk at the Embassy Suites in Riviera Beach, Florida, saw a woman fitting Lisa Costello's description using Black's credit card. In view of the evidence presented, even if the issue had been preserved, the trial court did not err in concluding that a corpus delicti for murder had been established prior to the admission of the confession.

Kidnaping
The State's kidnaping charge is based on two theories: 1) Mackerley's luring Black to Florida under the false pretense of a business deal; and 2) Mackerley's placing Black in a headlock prior to shooting him. We agree with Mackerley that neither one of the State's theories of prosecution as to kidnaping are legally valid since, even if proven, those allegations are insufficient to constitute kidnaping under Florida law. Consequently, the trial court erred in denying Mackerley's motion for judgment of acquittal on the kidnaping charge.
The State's first theoryMackerley's enticing Black to Florida by trickis easily dismissed by reference to the text of the kidnaping statute itself. Kidnaping means "forcibly, secretly or by threat confining, abducting or imprisoning another person against his will." § 787.01(1)(a), Fla. Stat. (Supp.1996). Since there was no *137 force or threat, the State relies on the word "secretly" in the statute to argue that Mackerley's clandestine plan to lure Black to Florida qualifies as kidnaping. The problem with the State's argument here is that the word "secretly" modifies "confining, abducting or imprisoning." Taking the fact of Mackerley's alleged plan to secretly lure Black to Florida under false pretenses as true, there still was no confinement, abduction or imprisonment of Black. Black came to Florida voluntarily of his own free will, albeit as a result of a proposed business deal that turned out to be disingenuous. Black's trip to Florida as a result of this bogus invitation does not present a scenario which can support the State's claim that Black was confined, abducted, or imprisoned against his will by Mackerley.
The State's argument that Mackerley's holding Black in a headlock while shooting him amounts to kidnaping under the statute also lacks merit. Although Mackerley could have shot Black without putting him in a headlock, holding Black in the headlock had no significance independent of the murder and was merely incidental to the shooting. See Faison v. State, 426 So.2d 963, 965 (Fla.1983)(holding that a confinement or movement of victims during the commission of another crime may be kidnaping only if the movement or confinement is not slight, is not of the kind inherent in the nature of the other crime, and has some significance independent of the other crime in that it makes the other crime substantially easier to commit or substantially lessens the risk of detection); see also Rohan v. State, 696 So.2d 901 (Fla. 4th DCA 1997)(finding that the victim's confinement was indistinguishable from the battery where the defendant forced his way into the home, began pushing the victim, and forced her into the bedroom); Berry v. State, 668 So.2d 967, 969 (Fla.1996)("[T]here can be no kidnap[]ing where the only confinement involved is the sort that, though not necessary to the underlying felony, is likely to naturally accompany it."); Jenkins v. State, 433 So.2d 603 (Fla. 1st DCA 1983)(reversing the kidnaping charge because the record was consistent with a supposition that the victim was murdered immediately, so that, in this case, her confinement before death was inconsequential in the commission of further acts).

Premeditated or felony murder
The State's first degree murder case against Mackerley went to the jury on the dual theories of felony murder and premeditation. Because the State's theory of kidnaping was legally inadequate, a conviction for felony murder would be improper as a matter of law. Mackerley argues that since the jury rendered a general verdict of guilt of first degree murder, the conviction may have been based upon the State's theory of felony murder rather than on premeditation. Mackerley's position is strengthened by the fact that the jury convicted him under the State's legally inadequate theory of kidnaping. Consequently, Mackerley contends that he is entitled to a new trial on the first degree murder charge because the trial court's failure to grant his motion for judgment of acquittal on the kidnaping charge was prejudicial to him in relation to the murder charge. We find logic in this argument.
Under common law, a general verdict was valid so long as it was legally supportable on one of the submitted grounds, even though the verdict form did not indicate whether the valid ground or the invalid ground was the basis for the jury's action. See Griffin v. United States, 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991). The United States Supreme Court, however, eventually made a distinction in the law for general verdicts in federal prosecutions where one theory of guilt was based on a ground which was legally inadequate and where one theory of guilt was based on a ground which was evidentially insufficient. The Court held in Yates v. United States, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957), partially overruled *138 by Burks v. United States, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), that a general verdict is invalid when one of the possible bases of conviction is legally inadequate. Conversely, in Griffin v. United States, 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991)(relying on Turner v. United States, 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970)), the Court upheld a general verdict where one of the possible bases of the conviction failed because of insufficient evidence.
This court recognized that distinction in Tricarico v. State, 711 So.2d 624 (Fla. 4th DCA 1998), when we determined that the defendant, whose murder charge went to the jury on both a premeditated murder and felony murder theory, was entitled to a new trial because the underlying felony, attempted trafficking in cocaine, was not a designated felony in the first degree murder statute. Because felony murder could not legally be predicated upon attempted trafficking in cocaine, the court treated the felony murder as legally inadequateas though the defendant had been convicted of a nonexistent crime. See id. at 626.
In Tricarico, this court pointed out that:
[I]n Griffin v. United States, ..., the Court clarified that the Yates rule did not apply when the alternative ground was legally proper but failed because of insufficient evidence. As Justice Scalia explained in Griffin:

"Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law-whether, for example, the action in question is protected by the Constitution, is time barred, or fails to come within the statutory definition of the crime. When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error. Quite the opposite is true, however, when they have been left the option of relying upon a factually inadequate theory, since jurors are well-equipped to analyze the evidence. As the Seventh Circuit has put it: `It is one thing to negate a verdict that, while supported by the evidence, may have been based upon an erroneous view of the law; it is another to do so merely on the chance-remote, it seems to us, that the jury convicted on a ground that was not supported by adequate evidence when there existed alternative grounds for which the evidence was sufficient.'" [emphasis supplied, c.o.]
502 U.S. at 59-60[, 112 S.Ct. 466].
Tricarico, 711 So.2d at 625-26 (bolded emphasis added).
The Tricarico court also relied heavily on Valentine v. State, 688 So.2d 313 (Fla. 1996), and stated,
To determine whether there is a risk that the jury relied on the legally improper felony murder theory, we are guided by the cases regarding the nonexistent crime of attempted felony murder. Although in this instance there was a crime of felony murder, that crime could not be predicated on attempted trafficking in cocaine. Hence we treat the felony murder crime used in this case as legally inadequate, like a nonexistent crime.
In Valentine v. State, ..., the supreme court held that a defendant's conviction for attempted first-degree murder would be reversed because the jury may have relied on a legally unsupportable theory. The court explained:
"Valentine next argues that his conviction for attempted first-degree murder is error. We agree. The jury was instructed on two possible theories on this count, attempted first degree felony murder and attempted first degree premeditated murder, and the verdict fails to state on which ground the jury relied. After Valentine was sentenced, this Court held *139 that the crime of attempted first degree felony murder does not exist in Florida. Because the jury may have relied on this legally unsupportable theory, the conviction for attempted first-degree murder must be reversed. See Griffin v. United States, 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991)." [emphasis supplied, c.o.]
688 So.2d at 317. The supreme court did not consider whether or how strongly the evidence supported the premeditated murder theory in an attempt to find harmless error.
Tricarico, 711 So.2d at 626-27.
We conclude that the instant case presents precisely the situation discussed in Valentine, Tricarico, and Yates, since the alternative basis for the first degree murder conviction here fails not simply for want of proof, but because it is legally unsupportable. The only difference between the instant case and the situation presented in Tricarico is that a properly charged kidnaping theory can support a felony murder conviction, whereas the attempted trafficking in cocaine charge considered in Tricarico could never support the felony murder conviction. Nevertheless, we find that distinction between Tricarico and the instant case immaterial; the critical similarity is that the underlying foundations for the felony murder theories in both cases were predicated on legal theories which could not, as a matter of law, support a felony murder conviction. Since there was a general verdict form, we cannot tell whether the jury based the first degree murder conviction on felony murder or premeditation.
The preceding review of the authorities would seem to indicate a clear reversal of the murder conviction in this case and remand for a new trial. Nevertheless, we find this case materially indistinguishable from the recent case of Delgado, where our supreme court affirmed a first degree murder conviction which went to the jury on the dual theories of felony murder and premeditation. See 25 Fla. L. Weekly at S79, ___ So.2d at ___. The supreme court reversed the conviction for armed burglary after an extensive historical analysis of the law relating to burglary, and concluded that the theory of prosecution used by the State to support the charge against Delgado was legally inadequate. Delgado was prosecuted for burglary on the theory that although he had been invited to enter the victims' home, at some point, consent for him to be there must have been withdrawn by the victims since Delgado committed an assault against them while there. In short, the court went on to hold that if a defendant can establish that he was an invitee on the premises then he has a complete defense to the charge of burglary except where he thereafter secrets himself from the host and "surreptitiously" remains on the premises. This holding represented a dramatic change in Florida law on burglary and made the State's burglary charge legally unsupportable since as the court stated:
In the present case, there is no question that appellant was invited to enter the victims' home. At some point in time after the appellant was inside, he proceeded to commit two heinous murders. However, these actions do not amount to burglary. This is not to say that appellant has not committed a crime; he clearly has committed two murders. Nevertheless, appellant's actions are not the type of conduct for which the crime of burglary was intended to punish.
Delgado, 25 Fla. L. Weekly at S82, ___ So.2d at ___.
The supreme court in Delgado went on to conclude that the error in sending the burglary charge to the jury was harmless since the evidence supported the conviction for premeditated murder:
This Court has previously stated that even if the evidence does not support felony murder, any error in charging the jury on that theory is harmless where the evidence supports a conviction for premeditated murder. See Griffin v. *140 United States, 502 U.S. 46[, 112 S.Ct. 466, 116 L.Ed.2d 371] (1991); McKennon v. State, 403 So.2d 389 (Fla.1981)(finding error to instruct on robbery as it relates to felony murder where there was no basis in the evidence for the robbery instruction). See also San Martin v. State, 717 So.2d 462 (Fla.1998)(reversal is not warranted where general verdict could have rested upon theory of liability without adequate evidentiary support when there was alternative theory of guilt for which evidence was sufficient), cert. denied, [___ U.S. ___,] 119 S.Ct. 1468[, 143 L.Ed.2d 553] (1999).
25 Fla. L. Weekly at S82, ___ So.2d at ___. It is important to note that both McKennon and San Martin involved a general verdict in which one of the theories of prosecution was based on insufficient evidence.
Like the kidnaping charge which served as the underlying felony in the State's case for felony murder in the instant case, the burglary charge in Delgado was based on the State's factual hypothesis, which even if proven, did not amount to the crime charged. In relying on McKennon and San Martin, two cases that involved general verdicts in which one of the theories of prosecution was based on insufficient evidence, the supreme court in Delgado made no distinction between cases involving evidentiary insufficiency and legal inadequacy. The court in Delgado held that the error in instructing the jury on the State's legally inadequate theory of burglary was harmless because there was evidence in the record to support a finding of premeditation.
Following Delgado, we are constrained to conclude that the trial court's error in sending the kidnaping charge to the jury in the instant case was harmless; based upon our review of the record, viewed in the light most favorable to the State, there was evidence to support a finding of premeditation. Nevertheless, we remain troubled in affirming Mackerley's murder conviction, especially since the jury convicted Mackerley of kidnaping based on the State's theory of prosecution, which this court has rejected as a matter of law. In our analysis, we find it difficult to conclude that there was no reasonable possibility that the jury's improper consideration of the kidnaping charge did not contribute to Mackerley's first degree murder conviction; however, Delgado indicates that the error here is, as a matter of law, harmless.
In conclusion, we reverse the kidnaping conviction and affirm the first degree murder conviction. We certify the following question to the Florida Supreme Court as one of great public importance:
Is it harmless error when a defendant is convicted by general verdict for first degree murder on the dual theories of premeditation and felony murder where the felony underlying the felony murder charge is based on a legally unsupportable theory of which the defendant is nevertheless convicted, and there is evidence in the record to support the jury's finding of premeditation?
AFFIRMED in part; REVERSED in part.
FARMER and HAZOURI, JJ., concur.
NOTES
[1] A challenge to a conviction on the ground that the trial court admitted a confession or an admission against interest without independent proof of the corpus delicti of the crime is not fundamental error. See Phillips v. State, 719 So.2d 882 (Fla.1998).
[2] To support a conviction, however, the corpus delicti must be proven beyond a reasonable doubt. See Meyers, 704 So.2d at 1369.